# CHARLES W. YOST v. UNION PACIFIC RAIL-ROAD COMPANY; Appellant.

Division Two, July 5, 1912.

1. **NEGLIGENCE: Action for Injuries: Law Governing.** In an action in Missouri against a railroad for personal injuries suffered in Colorado, the law of Colorado governs, and a demurrer to a Nebraska Statute of Limitations pleaded in defense, should be sustained.

2. ———: Master and Servant: Employer's Liability Act: Common Law Action: Limitations. The Colorado Act of 1893, p. 129, giving an employee a right of action for his employer's negligence, did not abolish the common law right of action, and so the two year limitation placed upon the action given by the statute does not apply to an action brought under the common law.

3. APPEAL: Demurrer: Ruled Upon before Proof to Sustain Ruling. Where the defendant pleaded a Colorado Statute of Limitations, and the proof at the trial, as well as the plaintiff's reply, showed such statute to be inapplicable, he cannot complain that a demurrer was sustained to his plea, although the inapplicability of the statute had not been proved when the court made its ruling.

4. ———: Exceptions: Sufficiency. Where the bill of exceptions recites that "defendant's motion for new trial and in arrest of judgment are by the court overruled, to which ruling and action of the court" the defendant duly excepted, the exception was properly saved.

5. NEGLIGENCE: Master and Servant: Injury to Servant: Assumption of Risk: Question for Jury. Where in an action by an employee against a railroad for injuries, there is a conflict of evidence concerning the open space below a spread-bar in which plaintiff's foot was caught, both as to the customary construction on that road and as to the conformity of this space to the construction asserted by the road to be uniform, and it did not appear that the plaintiff had prior knowledge of the construction at the point of injury, the question whether he assumed the risk was for determination by the jury.

6. ———: ———: ———: Knowledge of Defect: Question for Jury. Where the dangerous space beneath a spread-bar by which the plaintiff was injured was not open and obvious, and the plaintiff denied that he knew anything about it prior to his injury, the question whether knowledge of the existence of the defect was to be imputed to him from the exercise of ordinary care was one for the jury.

7. ———: ———: ———: Maintenance of Defective Switch: Question for Jury. Where, in an action against a railroad for injury from a defective switch, the evidence was conflicting, both as to the alleged custom in constructing switches and the conformity of this particular switch to the custom, the question whether the maintenance of the switch was negligence was for the jury.

8. ———: ———: ———: ———: ———: Defective Construction in only one Particular. And the fact that the switch conformed to the standard requirements in all particulars except one does not exonerate the railroad from liability for injury resulting from conditions created by that one departure.

9. ———: ———: ———: **Abandonment of Rule of Safety: Question for Jury.** In an action by a brakeman for injuries suffered while walking between moving cars to disconnect the air hose, there was evidence that employees of the road constantly went between moving cars for the same purpose, although a rule of the company, of which plaintiff had knowledge, forbade it; and there was also evidence that plaintiff had been instructed to do the same by the conductor to whom he was sent for instructions when hired. *Held*, that the question of the defendant railroad's abandonment of the rule was for the jury.

10. ———: ———: ———: **Contributory Negligence: Question for Jury.** Whether or not, under all the circumstances, the negligence of the master or the negligence of the servant was the proximate cause of the injury, is, in all cases where there is any doubt, a question for the jury.

11. ———: ———: ———: **Instructions: Evidence: Special Instructions for Master.** Where in an action by a brakeman for injuries received while walking between moving cars to disconnect the air hose, it appeared that the plaintiff had been specially instructed so to make the disconnection, and that the printed rules given him by the company required him to obey "the rules and special instructions," it was not error to instruct that, if he was injured while complying with the special instructions, then the defendant railroad's rule to the contrary was no defense.

12. ———: ———: ———: **Evidence: Federal Safety Appliance Act.** In an action by a brakeman for injuries suffered while walking between moving cars to disconnect the air hose, the admission of evidence of defendant's abandonment of a rule prohibiting going between moving cars was not violative of the spirit of the Federal Safety Appliance Act, requiring interstate carriers to equip their cars with a device for coupling and uncoupling, defendant in this case not having installed any device for disconnecting the air hose.

13. **JURY: Motion to Discharge.** A motion to discharge the jury because of things which occurred in their presence and to which appellant's counsel, although aware of them, made no objection at the time, is made too late if not made until several days after the occurrences.

14. **NEW TRIAL: Grounds: Argument of Counsel.** In a brakeman's action against his employer for injuries, the trial court did not abuse its discretion by denying a new trial sought on the ground that plaintiff's counsel said in closing, in response to opposing argument: "Do you think the poor boy has unlimited means to run all over this railroad like that railroad company with their passes and their money?"

15. **VERDICT:** Excessive: Damages. Plaintiff, a brakeman employed by defendant, was twenty-seven years old and in good health, when, as a result of defendant's negligence, he lost his right leg and received other injuries, some of them permanent. *Held*, that a verdict for $25,000 is excessive and must be reduced to $15,000.

Appeal from Jackson Circuit Court.—*Hon. E. E. Porterfield*, Judge.

AFFIRMED (*conditionally*).

*N. H. Loomis, R. W. Blair*, and *Douglass & Watson* for appellant.

(1) There was no negligence shown in the construction and maintenance of the switch at which plaintiff was injured. The evidence shows that this switch was of a standard type adopted and generally used on defendant's road, also on numerous other up-to-date railroads in this part of the country, and that said switch was in good repair. The only negligence claimed is in the adoption and use of such a type of switch with open spaces on each side of the spread bar and underneath the same. Such adoption and construction of a switch in general use by other up-to-date railroads was not negligence. Grattis v. Railroad, 153 Mo. 380; Tabler v. Railroad, 93 Mo. 79; Smith v. Railroad, 69 Mo. 32; Dolge v. Railroad, 119 N. W. 1066; Tuttle v. Railroad, 122 U. S. 189; Illick v. Flint, 67 Mich. 632; Boyd v. Harris, 176 Pa. St. 484; Mobile v. Healey, 100 Ill. App. 586; Railroad v. Riley, 145 Fed. 137. (2) The testimony of plaintiff shows he was familiar with the general character and construction of this type of a switch, knew it was in general use on defendant's railroad, over which he worked, knew there necessarily had to be an open space on each side of said spread bar and underneath the same, to permit the free and uninterrupted operation of this switch, and the manner of construction was open and obvious

to the eye, and with such knowledge and means of
knowledge plaintiff entered into and continued in the
service of defendant up to the date of his injury, and
had used said switches on many occasions and knew
how they were constructed and operated, and he there-
by accepted the service as brakeman subject to the
risks of injury from the use of such a switch and was
not and is not entitled to recover in this action. Tram-
way v. Nesbit, 22 Col. 408; 1 Labatt on Master and
Servant, p. 102; Sweeney v. Envelope Co., 101 N. Y.
520; Hodgkins v. Railroad, 119 Mass. 419; Railroad v.
Seley, 152 U. S. 145; Railroad v. Grannon, 90 Pac.
855; Company v. Devoe, 85 Pac. 633; Railroad v.
Scott, 81 Pac. 763; Hughes v. Schnabel, 78 Pac. 623;
Mining Co. v. Diefenthaler, 76 Pac. 981; Harvey v.
Mining Co., 70 Pac. 1001; Ragan v. Railroad, 56 N. W.
612; Batterson v. Railroad, 53 Mich. 125; Gibson v.
Railroad, 63 N. Y. 450; Burnham v. Railroad, 68 N. H.
567; Hayden v. Mfg. Co., 29 Conn. 548; Sullivan v.
Mfg. Co., 113 Mass. 396; Railroad v. Drescoll, 176 Ill.
330; Lemoine v. Railroad, 177 Mass. 89; Simmons v.
Railroad, 110 Ill. 340.   (3)  (a)  The testimony in this
case establishes the fact that this type of a switch was
in general use on many up-to-date railroads in this
country, and was regarded as one of the best kind of
switches in use.  A master performs his duty to his
servant when he furnishes appliances of ordinary char-
acter, such as are used in the ordinary usage of the
business by reasonably prudent persons engaged in
the same line of business.  Jackson v. Railroad, 104
Mo. 448; Bohn v. Railroad, 106 Mo. 429; Bradley v.
Railroad, 138 Mo. 302; Minnier v. Railroad, 167 Mo.
112; Holmes v. Bradenbaugh, 172 Mo. 64; Chrismer
v. Tel. Co., 194 Mo. 208; Brands v. Car Co., 213 Mo.
698; Blundell v. Company, 189 Mo. 558; Higgins v.
Fanning, 195 Pa. St. 599; Coyne v. Lounge Co., 222
Mo. 506.  (b)  Plaintiff had full knowledge of the char-
acter and construction of these switches, besides the

construction was so open and obvious he could not be ignorant of their construction and the dangers incident to stepping into said open spaces between cars in motion, and there was no negligence in not warning plaintiff of danger, as he agreed to acquaint himself with the switches of defendant when he entered its employ. Quinn v. Railroad, 175 Mass. 151; Machette v. Railroad, 132 Ind. 334; Railroad v. Utz, 133 Ind. 265; Railroad v. Bragmeier, 119 Ill. 51; La Croy v. Railroad, 132 N. Y. 570; Bennett v. Railroad, 2 N. D. 112; Karrer v. Railroad, 76 Mich. 400; Alexander v. Railroad, 83 Ky. L. R. 598; 1 Labatt, Master and Servant, Sec. 416; Railroad v. Emmett, 83 Va. 640; Brooks v. Railroad, 47 Fed. 687. (4) This case should be reversed because plaintiff assumed the risk of injury from using the switch complained of by him. (a) Plaintiff received the injury complained of in Colorado, and his cause of action, if any, must be determined by the law of Colorado, as it existed at that time. Root v. Railroad, 195 Mo. 367; Fogarty v. Railroad, 180 Mo. 490; Lee v. Railroad, 195 Mo. 400; Minnier v. Railroad, 194 Mo. 308; Elliott v. Railroad, 204 Mo. 18; Newlin v. Railroad, 222 Mo. 375; Alexander v. Railroad, 48 Oh. St. 623. (b) Under the plaintiff's testimony, and the law of Colorado introduced in evidence he assumed the risk of injury from using the switch in question. Railroad v. Difenthaler, 32 Colo. 396; Railroad v. Scott, 34 Colo. 106; Railroad v. De Voe, 36 Colo. 273; Dickinson v. Newhouse, 34 Colo. 232; Jackson v. Railroad, 104 Mo. 448; 1 Shear & Red. Neg. (4 Ed.) 185; Thomas v. Railroad, 109 Mo. 200; Smith v. Railroad, 69 Mo. 32; Flynn v. Railroad, 78 Mo. 203; Fuller v. Railroad, 108 Mich. 690; Tuttle v. Railroad, 122 U. S. 189; Randall v. Railroad, 109 U. S. 478; Kohn v. McNulta, 147 U. S. 241. (5) (a) Plaintiff was guilty of contributory negligence as a matter of law and the court should have directed a verdict for defendant. Moore v. Railroad,

146 Mo. 582; Webber v. Railroad, 100 Mo. 194; Smith v. Box Co., 189 Mo. 715; Hurst v. Railroad, 163 Mo. 309; Touner v. Railroad, 52 Mo. App. 615; Finell v. Railroad, 29 N. E. (N. Y.) 825; Ragon v. Railroad, 56 N. E. (Mich.) 612; Appel v. Railroad, 111 N. Y. 550; Pa. Co. v. Hankey, 93 Ill. 580; Foley v. Railroad, 48 Mich. 622; Tuttle v. Railroad, 122 U. S. 189; Grand v. Railroad, 83 Mich. 564; Dixon v. Railroad, 198 N. Y. 458. (b) Plaintiff received his injury while performing work in direct violation of defendant's rule, 742, and was thereby guilty of such negligence as bars any recovery. Francis v. Railroad, 110 Mo. 387; Schaub v. Railroad, 106 Mo. 74; Darracott v. Railroad, 83 Va. 228; 1 Labatt on Master & Servant, Sec. 365; Railroad v. Grand, 83 Mich. 564; Mathews v. Railroad, 227 Mo. 250; Gleason v. Railroad, 73 Fed. 647; Railroad v. Craig, 80 Fed. 488; Lockwood v. Railroad, 55 Wis. 51. (c) There was no evidence showing that defendant waived compliance with the requirement of rule 742 aforesaid. (d) To permit plaintiff to show a waiver of said rule by a violation thereof by himself and some other employees, violates the spirit and intent of the Act of Congress known as the Safety Appliance Act. 27 U. S. Stat. at Large, 531; Gilbert v. Railroad, 128 Fed. 539. (e) To permit plaintiff to prove a waiver of said rule 742 because he violated the same, violates the terms of his employment wherein he agreed to obey said rules of defendant, and such violation of his contract of employment whereby he received his injury was negligence on his part barring a recovery. Quinn v. Railroad, 175 Mass. 151; Davis v. Company, 34 W. Va. 500; Railroad v. Ryan, 69 Tex. 665; Love v. Railroad, 89 Ia. 420; Railroad v. Finley, 63 Fed. 228; Railroad v. Stephens, 189 Ill. 226; Railroad v. Snyder, 56 N. J. L. 326; Fluhrer v. Railroad, 121 Mich. 212; Spaulding v. Railroad, 98 Iowa, 205; Railroad v. Craig, 80 Fed. 488; Deeds v. Rail-

road, 74 Iowa, 154. (6) The verdict is excessive. Farnith v. Railroad, 102 Mo. 438; Burdict v. Railroad, 123 Mo. 241; Rodney v. Railroad, 127 Mo. 676; Hollenbeck v. Railroad, 141 Mo. 113; Chitty v. Railroad, 148 Mo. 64; Chitty v. Railroad, 166 Mo. 443; Newcomb v. Railroad, 81 S. W. 1069; Markey v. Railroad, 84 S. W. 61; Phippin v. Railroad, 93 S. W. 411; Brady v. Railroad, 102 S. W. 979; Gidney v. Railroad, 103 S. W. 43. (7) The court should have granted defendant a new trial because of misconduct of counsel for plaintiff in going outside the evidence and stating to the jury that plaintiff was a poor boy without money to get witnesses and that defendant had unlimited means and passes to bring witnesses to the trial. Bishop v. Hunt, 24 Mo. App. 373; Lloyd v. Railroad, 53 Mo. 509; Williams v. Railroad, 123 Mo. 573; Harper v. Tel. Co., 92 Mo. App. 304; Fatham v. Tumily, 34 Mo. App. 236; Holliday v. Jackson, 21 Mo. App. 661; Nichols v. Metzger, 43 Mo. App. 618; Evans v. Trenton, 20 S. W. 614; Brown v. Swineford, 44 Wis. 282; Railroad v. Field, 137 Fed. 14.

*Rosenberger & Reed* and *Jacob L. Lorie* for respondent.

(1) There is nothing for this court to review except the record proper, because no proper exception was saved to the court's action in overruling the motion for a new trial. McKee v. D. G. Co., 152 Mo. App. 241; St. Joseph v. Ensworth, 65 Mo. 628; Harrison v. Bartlett, 51 Mo. 170; Parsons v. Clark, 98 Mo. App. 28. (2) The defendant was guilty of gross negligence in constructing the switch rod at the place where plaintiff was injured in the manner that it did, since it could have so constructed its switch at that point as to have made it a good switch for all practical purposes and at the same time have had it reasonably safe for employees doing switching over it.

20 Am. & Eng. Ency. Law (2 Ed.), 93; Railroad v. Gaines, 54 Fed. 1001; Railroad v. Ogden, 3 Colo. 499; Wilson v. Railroad, 7 Colo. 101; Railroad v. Burchard, 35 Colo. 539; Railroad v. Reiter, 47 Colo. 417; Rice v. Van Why, 49 Colo. 7; Jones v. Railroad, 178 Mo. 528; Hamann v. Bridge Co., 136 Wis. 39; Railroad v. Brady, 45 Colo. 203; Vautrain v. Railroad, 78 Mo. 44; Reichla v. Gunsfelder, 32 Mo. App. 43; Reed v. Railroad, 94 Mo. App. 371; Charlton v. Railroad, 200 Mo. 413; Murphy v. Railroad, 115 Mo. 111; Kelley v. P. W. Co., 107 Mo. App. 490; Huhn v. Railroad, 92 Mo. 444; George v. Railroad, 225 Mo. 364; Austin v. Railroad, 93 Iowa, 236; Pierson v. Railroad, 127 Iowa, 13; Railroad v. Behmer, 189 U. S. 68; Railroad v. McDonough, 161 Fed. 657; Railroad v. O'Brien, 161 U. S. 457; Railroad v. Saunders, 166 Ill. 270; Hannah v. Railroad, 154 Mass. 529; Plank v. Railroad, 60 N. Y. 607; Railroad v. Keegan, 87 Fed. 849; Railroad v. Kines, 132 Ill. 161; Railroad v. Sweet, 45 Ill. 197; Railroad v. McDade, 112 Fed. 188; Railroad v. Morrissey, 177 Ill. 376; 26 Cyc. 1108. (3) Plaintiff being injured by a structural defect, and said defect being due to the negligence of defendant, plaintiff cannot be charged with assumption of risk in going between the cars at the point he did. Railroad v. Ogden, 3 Colo. 499; Railroad v. O'Brien, 16 Colo. 219; Grant v. Varney, 21 Colo. 329; Burnside v. Peterson, 43 Colo. 382; Railroad v. Burchard, 35 Colo. 539; Railroad v. Warring, 37 Colo. 122; Rice v. Van Why, 49 Colo. 7; George v. Railroad, 225 Mo. 411; Obermeyer v. Chair Co., 229 Mo. 97; Jewell v. Bolt Co., 231 Mo. 176; Corby v. Tel. Co., 231 Mo. 417; King v. Railroad, 143 Mo. App. 279; Strickland v. Woolworth, 143 Mo. App. 528; Brady v. Railroad, 206 Mo. 509; Charlton v. Railroad, 200 Mo. 413; Hulin v. Railroad, 92 Mo. 440; Sullivan v. Railroad, 107 Mo. 66; Compton v. Railroad, 82 Mo. App. 175; Browning v. Kaster, 107 Mo. App. 62; Brady v. Railroad, 206 Mo. 528. (4) Whether or not plain-

tiff was guilty of contributory negligence is a question for the jury. McManus v. Railroad, 118 Mo. App. 152; Brady v. Railroad, 44 Colo. 283; Railroad v. Smock, 23 Colo. 456; Barry v. Railroad, 98 Mo. 69; Railroad v. Baker, 91 Fed. 224; Railroad v. Nichols, 50 Fed. 719; Railroad v. Craig, 73 Fed. 642; Railroad v. Kier, 41 Kan. 611; Stockyards v. Godfrey, 65 N. E. (Ill.) 90; Dresser on Employer's Liability, p. 523; Alkayn v. Railroad, 43 Fed. 193; Sprong v. Railroad, 58 N. Y. 61; Railroad v. Perry, 6 So. (Ala.) 40; Smith v. Railroad, 18 Fed. 309; Fish v. Railroad, 96 Iowa, 702; Railroad v. Slattery, 57 Kan. 499; Lowe v. Railroad, 89 Iowa, 420; Eastman v. Railroad, 101 Mich. 597; Railroad v. Rudd, 88 Va. 648; Strong v. Railroad, 94 Iowa, 380; Fish v. Railroad, 96 Iowa, 72. (5) The court did not err in sustaining plaintiff's demurrer to the defenses which attempted to plead the Statutes of Limitations of Nebraska and Colorado, respectively. (6) The verdict is not excessive. Hall v. Railroad, 124 Ga. 322; Scullin v. Railroad, 184 Mo. 709; Mackey v. Railroad, 185 Mo. 348; Shohoney v. Railroad, 231 Mo. 131; Railroad v. Webster, 137 S. W. 1109; Railroad v. Gray, 137 S. W. 729; Corby v. Tel. Co., 231 Mo. 447; Loftus v. Railroad, 220 Mo. 470; Setzler v. Railroad, 227 Mo. 803. (7) It is next urged that this judgment should be reversed because of the presence in the court room of plaintiff's wife and child. It should be sufficient answer to this to say that plaintiff's wife and child had a clear right to be present in court during the trial. State v. Fogg, 206 Mo. 696; Railroad v. Smock, 23 Colo. 456.

BLAIR, C.—This is an action to recover damages for personal injuries sustained by respondent while employed as a brakeman. From a judgment for $25,000 this appeal was taken. The petition alleged that respondent's injury resulted from the defective,

unsafe and dangerous condition of one of appellant's switches. at Julesburg, Colorado, and the negligent omission of appellant to warn respondent thereof. The answer consisted of (1) a general denial and then pleaded (2) contributory negligence, under the laws of Colorado, (3) the violation of a rule of appellant, (4) assumption of risk under the laws of Nebraska, (5) assumption of risk, under the laws of Colorado, (6) the four-year Statute of Limitations of Nebraska and (7) a two-year Statute of Limitations of Colorado. A demurrer to the sixth and seventh pleas was sustained. To the remainder of the answer respondent filed a reply consisting of a general denial, allegations that at the time of the injury the common law was in force in both Colorado and Nebraska, and that the rule pleaded had been waived and abandoned.

The respondent was injured June 3, 1902, while disconnecting the air hose between two moving cars in the yards at Julesburg, Colorado. Having made the disconnection he started to step out from between the cars when his right foot went into the opening between a crosstie and one of the spread bars of a split switch through which the cars were passing, his foot became wedged or fastened, he was thrown to the ground and the engine and two cars passed over him, inflicting severe injuries.

In January, 1902, respondent, then a grocery clerk, twenty-seven years old, and without experience in railroading, applied to H. Cox, appellant's chief train dispatcher at North Platte, Nebraska, for employment as a brakeman. Cox, who was empowered to hire and discharge employees as well as to perform other duties, gave respondent a time card containing, among other things, numerous rules and regulations, told him to "study up on the hand and lantern signals, train signals, fixed signals and on how to flag trains in case of accident" (but gave no instructions as to the rules relating to the safety of employees),

and sent respondent to one of defendant's freight conductors for instructions. In pursuance of this direction, in the latter part of the same month, this conductor, Moses McFarland, took respondent on two trial or instruction trips and on these instructed him with regard to brakemen's duties, among many other things showing respondent how to disconnect the air hose between two moving cars, performing the operation for respondent's enlightenment, advising him as to the use of the handhold, telling him that in performing this duty he should always "give one hand to the company and one to himself" and also informing him that the work was done by the method thus exemplified; that it was the practical way of doing the work. Respondent made one trip as a brakeman in February, three in March, about twenty in April, two in May and was injured on his first trip in June. Five of these trips were made on local freight trains, five on passenger trains and the rest on through freights. There was little switching to be done except with the local freights.

On February 24, 1902, the appellant's board of examiners called respondent for examination but discovering that he did not have the book of rules, supplied him therewith and dismissed him temporarily. Respondent was recalled on February 27 and passed. The book mentioned contained 1880 rules, about 800 of which seem to have pertained directly or indirectly to brakemen and their duties. Respondent testified he read the rules. Among these was one forbidding brakemen to go between moving cars to couple or uncouple them.

On the day respondent was injured the train on which he was working as head brakeman (an extra freight) reached Julesburg about 7 or 7:30 a. m. The yards at Julesburg were of considerable extent. Appellant's main line ran about east and west through the yards. The easternmost switch in the yards led

into the east end of the passing track which was north of the main line. This switch is designated as switch No. 1. A switch leading from the passing track into a sidetrack north thereof is designated as switch No. 2. Switch No. 3 was some distance west of No. 1 and led from the appellant's main line into what was called a "lead track" which ran in a southwesterly direction and from which successive switches led into numerous tracks, near each other, running west from such switches and parallel with appellant's main line. Switch No. 4, the first switch on this lead track, called the incline switch, led into what is called the coal chute's track. It was at this switch respondent was injured. Switches Nos. 5 and 6 were next in order and led, respectively, from the lead track into the Colorado Central main line and the old Colorado Central main line. The switching orders, June 3, required the entraining of several cars, two of them being local cars which it was necessary to place next to two other local cars which were next the engine. The two cars were on the old Colorado Central main line and a number of other cars stood between them and the switch. The conductor brought his train down east of switch No. 3, backed in over switch 4 and through switch 5 and left the caboose and a car or two on the Colorado Central main line. The engine and the two other cars then backed down through switch 6 and "picked up" all the cars on the old Colorado Central main line except the two local cars mentioned, these being at the west end of the string on this track, and pulled out until the last car cleared switch 5. The purpose of the movements was to place all the cars taken off of track 6, and all but two in the original train, on the track with the caboose and then to back down to track 6 on which the two desired local cars had been left, couple to them and bring them up to track 5 and couple to the cars placed on that track.

Backing in on track 5 the cars brought from track 6 were coupled to the cars left on this track with the caboose. At the time this coupling was made the engine was on the main line and the train extended through switches 3, 4 and 5. Respondent was the head brakeman and it was his duty to uncouple cars near the engine when necessary. From switch 3 to switch 5 the cars moved in a southwesterly direction but as they passed through switch 5 and upon track 5 they turned somewhat and thence ran directly west. Respondent was standing some distance south of switch 4 in order that he might see along the train to the caboose on which the conductor was riding. The conductor had given the rear brakeman, Mitchell, the switching orders and Mitchell, as was customary, in the conductor's presence and view gave respondent the signal to ''cut off'' the two cars next the engine, i. e., to uncouple the second from the third car in the train. Respondent testified in substance that this signal meant and was understood to mean that he was immediately to go between the cars, disconnect the air hose and then uncouple the cars and that its meaning had been taught him by McFarland, who instructed him, and he had also observed its use by other brakemen. When the signal was given respondent ran up the bank to the opening between the second and third cars from the engine and about thirty-two or thirty-four feet from switch 4, went between those cars to disconnect the air hose, preparatory to drawing out the coupling pin. He took hold of the handhold and walked between the cars as they moved slowly along, disconnected the air hose and started to step out from between the cars when his right foot went down between a cross-tie and the second spread bar in switch 4, his foot becoming wedged in the space beneath the spread bar. In his struggles he pulled his foot out of his shoe, tearing the shoe in so doing. He fell between

the cars and the engine and the two cars passed over him.

Respondent testified that at the time he was injured the spaces between the spread bar and the ties on each side of it were four or five inches and that the space beneath the spread bar was three or four inches. The spread bar was of the kind called vertical (turned on edge), was about one and one-half inches wide and its top was half an inch below the level of the top of the ties. The distance from the top of the ties to the bottom of the space in which respondent's foot was caught was therefore, according to respondent's testimony, five or six inches. Respondent had never operated this particular switch before though he had passed over it on top of the car. At the time he stood south or southwest of it awaiting the signal he received, he was down below the switch and cars were passing over it all the time. He testified he had operated other switches on the road, that he had never particularly noticed the spread bar spaces, that he could have seen them on these other switches had he observed them, that he knew there were spaces between the spread bars of the switches he had operated and the ties on either side of them, spaces in which the spread bars moved, but was not familiar with the measurements and distances in these spaces, that he would have had to take special notice to discover those, had taken no special notice of them, but paid particular attention to the movements of the switch points to see that they "came over" to the rail, to the end that derailment might not result from an imperfectly closed switch. Respondent on further cross-examination said he did not know at the time whether the switch at which he was injured was different from others over which he had worked, that his mind was on the business in hand and he did not stop to consider the switch particularly, that he was not familiar with its construction, that he obeyed the signal given him

but would not have attempted it at that place had he "known there was a six-inch hole there." Respondent had done but little switching and the duty he had performed was to throw the lever at the switch stands, some four or five feet from the nearest rail.

There was evidence tending to show that the constant practice, in switching operations, both before respondent's employment and during his service was to go between moving cars to disconnect the air hose.

Evidence was also offered that the space beneath the spread bar at which respondent was injured was considerably greater than was necessary, safe or customary in such switches.

Appellant introduced evidence tending to show, among other things, that the switches on the Union Pacific in which vertical spread bars were employed were all constructed like that at which respondent was injured, that the spaces beneath all such spread bars were two inches and that such construction, including the space mentioned, was necessary and customary on well managed roads. There was also evidence to the effect that the space beneath the spread bars under which respondent's foot was caught was but two inches. Other evidence was to the effect that a six inch space beneath such spread bars was customary and the proper construction.

The common law was shown to be in force in Colorado and numerous decisions of the courts of that State were put in evidence.

I. The injury having occurred in Colorado the law of that State governs in this action. [Root v. Railroad, 195 Mo. l. c. 370, et seq., and cases cited; Newlin v. Railroad, 222 Mo. l. c. 391, 392; McGinnis v. Car & Foundry Co., 174 Mo. l. c. 227; Railroad v. Babcock, 154 U. S. l. c. 199; Railroad v. McDuffey, 79 Fed. 934; Railroad v. Keiffer, 132 Ky. l. c. 423, 424; Smith v. Railroad, 87 S. C. l. c. 138; Railroad v Becker, 67 Ark. l. c. 4; Railroad v. Carroll, 97 Ala.

126.] It follows that the action of the trial court in sustaining the demurrer to that part of the answer in which the Nebraska Statute of Limitation was pleaded was right and it also follows that the correctness of the court's action in also sustaining the demurrer to that part of the answer setting up the bar of the Colorado Act of April 8, 1893, must be examined in the light of the laws of Colorado, that limitation being effectual only in case the ''cause of action has been fully barred by the laws of the State, territory or country in which it originated'' (R. S. Mo. 1909, Sec. 1895), to wit, in this case, the laws of Colorado.

It is averred in the answer that the Legislature of Colorado, in 1893, passed an act as follows:

''Where, after the passage of this act, personal injury is caused to an employee, who is himself in the exercise of due care and diligence at the time: (1) By reason of any defect in the condition of the ways, works or machinery connected with or used in the business of the employer, which arose from or had not been discovered or remedied owing to the negligence of the employer, or of any person in the service of the employer, or entrusted by him with the duty of seeing that the ways, works and machinery were in proper condition; or (2) by reason of the negligence of any person in the service of the employer, entrusted with exercising superintendence, whose sole or principal duty is that of superintendence; (3) by reason of the negligence of any person in the service of the employer who has the charge or control of any switch, signal, locomotive engine or train upon a railroad, the employee, or in case injury results in death, the parties entitled by law to sue and recover for such damages shall have the same right of compensation and remedy against the employer, as if the employee had not been an employee of, or in the service of the employer, or engaged in his or its works.''

It was further averred that by Sec. 2065, R. S. Colo. 1908 (Laws 1901, p. 161), it is provided that:

"Every corporation or company, or individual who may employ agents, servants or employees, such agents, servants or employees being in the exercise of due care, shall be liable to respond in damages for injuries or death sustained by any such agent, employee, or servant, resulting from the carelessness, omission of duty or negligence of such employer, or which may have resulted from the carelessness, omission of duty or negligence of any other agent, servant or employee of the said employer, in the same manner and to the same extent as if the carelessness, omission of duty or negligence causing the injury or death, was that of the employer;" and that, by the same act, it was further provided that:

"No action for the recovery of compensation for injury or death under this act shall be maintained unless written notice of the time, place, and cause of injury is given to the employer within sixty days, and the action is commenced within two years from the occurrence of the accident causing the injury or death."

In this connection it was further alleged that by reason of the provisions of the Colorado statutes set out the cause of action in this case was barred, not having been commenced within two years after the respondent received his injuries.

A demurrer having been sustained to this portion of the answer, complaint is made of that ruling.

The common law was in force in Colorado in 1902. Negligence of the kind defined by paragraphs (1) and (2) of the act above quoted was actionable at common law and the petition in this case counts on common law negligence. The act did not abolish the common law action. That this is true is made clear by the universally recognized rule as to the strict construction of statutes in derogation of the common law and

put beyond all question by the decisions of the Su-
preme Court of Massachusetts, from the statutes of
which State the act in question was copied, and by
the decision of the Supreme Court of Colorado con-
struing the act pleaded.

In Ryalls v. Mechanics Mills, 150 Mass. 190 (de-
cided in 1889), it was held that the common law action
was unaffected by the statute, that it was not the
legislative intent to "make all actions by workmen for
defects in machinery statutory" and further held that
"it would not need the aid of previous exposition to
show that the main purpose of the statute, as the title
indicates, is to extend the liability of employers in
favor of employees, that it does not attempt to codify
the whole law upon the subject, and that it leaves open
some common law defenses and some common law lia-
bilities."

The court further declared in that case that the
statute was to be construed "liberally in favor of em-
ployees, and we ought to be slow to conclude that
indirectly, and without express words to that effect,
it has limited the workman's common law rights most
materially in respect to the condition and time of
bringing an action, and the amount which he can re-
cover. For all these provisions stand upon the same
footing with regard to the present case. . . . Cer-
tainly, with such a statute as this, we agree that com-
mon law rights are not to be taken away by doubtful
implications and affirmative words."

In concluding the court held that "in those cases
within the words" of the statute "in which the com-
mon law gives the employee a remedy, he still has a
right to sue under the same conditions, and to recover
damages to the same extent, as if the statute had not
been passed." It was specifically held that the re-
quirement in the act as to notice of the time and place
of injury did not apply to any common law action,

though the negligence giving rise to it might be included in that defined by the statute.

As the court indicated, the reason which supported this ruling as to the requirement of the act as to notice just as fully necessitated a like ruling as to the limitation of two years within which the act required actions *under it to be brought*. The reason for the holding that the statutory notice was not requisite in a common law action though the negligence counted on was included in that defined by the statute was that such common law action was *not* an action *under the statute*. If not an action under the statute, then the limitation as to time in the statute was and is as inapplicable as the provision as to notice.

After the statute had thus been construed in Massachusetts (1889), it was incorporated in the laws of Colorado in 1893 and brought with it the construction placed upon it in Massachusetts, as was directly held by the Supreme Court of Colorado in Colorado Milling & Elevator Co. v. Mitchell, 26 Colo. 284, in which case the question of the necessity of the notice required by the Act of 1893 was before the Supreme Court of Colorado. From the language of the act, its prior construction in Massachusetts, the construction given it by the Supreme Court of Colorado, and other decisions of like tenor (Railroad v. Norgate, 141 Fed. 247; Gmaehle v. Rosenberg, 178 N. Y. 147; Railroad v. Little, 75 Kan. 716), we are of the opinion that the provision of the Act of 1893 with reference to the time within which an action under that act might be brought has no application to the present case, it being an action at common law and not an action under the statute at all. It is true that until the evidence was taken there was no proof that the common law was in force in Colorado, but that fact was pleaded in respondent's reply and the proof of the fact was offered by appellant during the progress of the cause. The sole effect of the ruling sustaining the demurrer

was to deprive appellant of the benefit of the defense of the special limitation incorporated in the Act of 1893, and since the whole record shows appellant would have been as certainly deprived of it in the long run had the demurrer not been sustained as it was by the ruling sustaining the demurrer, the ruling on the demurrer has been treated as if appellant had conceded the existence in Colorado of the common law on the hearing on the demurrer. Having shown the law of Colorado to be such as to sustain the ruling, appellant cannot now complain merely because the trial court applied the correct rule before the formal proof of it was made.

II. It is contended by counsel for appellant that the recital in the bill of exceptions that "defendant's motion for new trial and in arrest of judgment are by the court overruled; to which ruling and action of the court the defendant at the time duly excepted and still excepts," shows no sufficient separate exception to the overruling of the motion for new trial and, consequently, matters of exception cannot be reviewed. The identical question presented has been recently decided (Sotham v. Drovers Telegram Company, 239 Mo., l. c. 606), and for the reasons given in that case the exception in this must be held properly saved.

III. It is argued that the court erred in overruling appellant's demurrer to the evidence. Several reasons are assigned for this position.

(1) It is said that under the laws of Colorado "in the absence of defective construction, or of negligence or want of care in reparation of machinery furnished him, the master incurs no liability arising from its use. The general rule is that the servant accepts the service subject to the risks incidental to it; and where the machinery and implements of the employer's business are at the time of a certain kind, and the servant knows it, he can make no claim upon

the master to furnish other or different safeguards.'' [Denver Tramway Co. v. Nesbit, 22 Colo. l. c. 411.] The argument is that ''plaintiff had entered into the employment of the defendant knowing that the defendant used the kind and character of switch complained of in his petition, and he accepted the employment with such knowledge and without any promise or inducement on the part of the defendant to enter its employment, that such switches would be discarded and different switches put in their place; and, therefore, . . . plaintiff assumed whatever risk of injury arose from the operation of said switch.'' Conceding that the rule quoted is, as contended by appellant's counsel, a complete statement of an applicable principle, the vice in the argument lies in the incorrect assumption of facts it contains. The evidence for appellant tends to show that a two-inch space beneath the spread bar was the uniform construction on its line in that respect and that this standard was conformed to in the switch at which the injury occurred. The evidence for respondent, however, tends to show that the space beneath the particular spread bar under which respondent's foot was caught was as much as four inches. The jury might well have inferred from the measurements of respondent's foot and the manner in which he was injured, that the space beneath the spread bar mentioned must have exceeded the alleged standard in that respect and that respondent's injury could not have resulted had the space beneath the spread bar been but two inches, which some of appellant's evidence tended to show was the uniform, proper and necessary space in switch construction. Further it was stipulated by appellant's counsel that the switch at which respondent was injured was, at the time, in all respects in the same condition it had been in for months and that appellant had knowledge of that condition during that time. Respondent testified he had no knowledge of the condition of switch

No. 4. Even could it be held that he must be presumed to have known the depth of the space between the spread bars on the switches he had operated, it cannot be held as a matter of law that he consequently knew the depth of such space beneath the spread bar under which his foot was caught, the evidence tending to show that this space exceeded that in all other switches.

The general principle as to the imputation of knowledge of risks incident to the character of the plant or appliances of the master as constructed and in use at the time the servant takes employment (the principle contended for by appellant), as is said by an eminent authority (1 Labatt on Master and Servant, Sec. 404), "obviously has no application to cases in which it is shown that conditions like those which caused the injury were, as a matter of fact, exceptional rather than normal." There being a conflict of evidence both as to the customary construction on appellant's road and as to the conformity of switch 4 to the construction appellant contended was uniform on its line, the questions of fact thus presented were for determination by the jury. The jury were instructed on this phase of the case fully and as favorably to appellant as it had the right to ask. The fact that the spaces between the spread bar and the ties (and the spread bar itself, in its dimensions), conformed to the customary construction, would not, even if concededly true, render necessary the conclusion that the space *beneath* the spread bar was the customary one. The evidence on this point was in conflict and from the evidence the jury might well have found that it was the nonconformity of this space to the customary construction appellant attempted to prove which caused the injury, i. e., that a two-inch space would not have admitted respondent's foot enough to have wedged it between the crosstie and the spread

bar and that a six inch space would have admitted of the easy withdrawal of his foot without difficulty in the circumstances. The trial court was right in refusing to sustain the demurrer on this ground.

(2) It is next contended that the demurrer should have been sustained on the ground that respondent must, as a matter of law, be held to have known and appreciated the particular danger incident to the condition of switch No. 4 and to have assumed the risk. Numerous cases are cited and quoted which announce the familiar rule as to the assumption of risks from known conditions and dangers and those so obvious that knowledge of them, under proper circumstances, will be imputed as a matter of law. To uphold this contention it would be necessary to absolutely reject the positive testimony of respondent that he did not know anything about this switch, never having operated it, and to hold that in the circumstances plaintiff must be conclusively presumed to have known of the existence of a dangerous space beneath the spread bar, a space which the evidence tended to show was not customary on appellant's road and not according to the standard of construction it claimed to have adopted. This we cannot do, in view of the rule universally followed and in force at the time in Colorado. [Railroad v. Brady, 45 Colo. l. c. 209; Denver Tramway Co. v. Nesbit, 22 Colo. 408; Rice v. Van Why, 49 Colo. l. c. 36, 38; Railway v. Keegan, 87 Fed. 849.] The question as to respondent's knowledge was whether by the exercise of ordinary care he could have known of the condition of switch No. 4 in the particular respect which substantial evidence tends to show caused the injury (Denver Tramway Co. v. Nesbit, 22 Colo. l. c. 411, 412), such defect not being of the open and obvious character necessary to charge him with knowledge as a matter of law. [Denver Co. v. Reiter, 47 Colo. l. c. 427, 428; Wells v. Coe, 9 Colo. l. c. 166, 167; Railroad v. Burchard, 35 Colo. l. c.

557.] Respondent denying knowledge, the question whether knowledge was to be imputed to him from the exercise of ordinary care was, in the circumstances, for the jury. [Railroad v. Brady, 45 Colo. l. c. 206.]

On this phase of the case the court instructed the jury fully, giving all instructions asked by appellant (with some modifications) and giving none for respondent which announced a rule less favorable to appellant than that contained in the instructions appellant requested. The modifications made by the court are complained of but no authorities are cited and the principles announced herein demonstrate the correctness of the trial court's action in this regard. These modifications need not, therefore, be specifically discussed.

So far as concerns the rule requiring respondent, as an employee, to use due care and to acquaint himself with the location of structures and objects, including switch stands, near enough to the track to endanger him when on the top or sides of cars, it added nothing to respondent's common law duty with respect to familiarizing himself with things other than those of the class specifically mentioned and certainly furnishes no sound basis for the contention made, in substance, that if respondent obeyed the rule and familiarized himself with switch stands it must follow as a matter of law that he thereby necessarily obtained full knowledge of the track construction in appellant's switches generally and in switch No. 4 in particular, including a knowledge of the space beneath the spread bar.

(3) It is next urged that the switch "was a standard switch, adopted and used by the up-to-date railroads in the same territory . . . and, therefore, there was *no negligence* shown in maintaining such switch" and the demurrer should have been sustained on that ground. So far as concerns anything con-

nected with this switch save the space beneath the spread bar, let it be assumed that counsel are correct. With respect to that space there was evidence tending to show there were roads constructing their switches with a space of an inch or less, others with a space of two inches and others with a six-inch space. The fact that the switch in all other respects conformed to the usual custom of construction of switches of the same kind does not exonerate appellant from liability for an injury resulting (as the jury could well have found in this case) from conditions created by a departure from the customary construction in a material particular. On the record in this case, we cannot hold as a matter of law that the trial court was compelled to believe appellant's witnesses, to the exclusion of those of respondent, as to the customary space left beneath vertical spread bars in proper switch construction and maintenance and direct a verdict for appellant on such finding. In fact, as to the proper depth of such space, appellant's own witnesses were themselves in marked disagreement with each other. Again, there was evidence that the space in this particular switch (No. 4) conformed to no standard or custom of construction as testified to by any witness. Another consideration is that the rule in Colorado is that "a railroad company is not relieved of its obligation to furnish a reasonably safe place by showing what other railroads have furnished, and the fact that open trestles are used on other railroads constitutes no defense to an action of this kind, if, as a fact, *the court cannot declare as a matter of law that the place furnished is reasonably safe.* The question is not *determined* by showing that other railroads have been maintained in the same condition as the defendant's trestle, but it is the *province of the jury* to determine, under all the circumstances of the case, whether the defendant has or has not been guilty of negligence." Railroad v. Brady, 45 Colo. l. c. 206.

It is true as contended, that *conformity* to custom in construction is not evidence of negligence (Bohn v. Railroad, 106 Mo. l. c. 433, 434), but departure from it ordinarily is and in this case both the existence of the alleged custom and the fact of conformity to it were disputed. That appellant had adopted a method of construction which it termed "standard" did not establish any custom. It appears that whatever method of construction was prescribed by appellant's engineers was termed "standard" construction. This word thus used had no efficacy to end all questions as to the customary character of the construction of appellant's switches generally and, of course, none to require the trial court to find as a matter of law that word thus used had no efficacy to end all question as it tended to show that the switch in question was not, in one most material particular, constructed even according to the "standard" fixed as indicated. In this connection it may be noted that the trial court gave appellant full benefit of the rule as to customary construction, giving all instructions asked by appellant on that subject and giving none for respondent less liberal than those given for appellant. The slight modification made by the court was correct in view of what has already been said. The question was for the jury and there was no error in the manner of its submission.

(4) Long prior to respondent's injury appellant had promulgated a rule forbidding brakemen to go between moving cars to couple or uncouple them "or follow other dangerous practices." This rule, among others, was given respondent when he applied for employment and he testified he had read it. It is now contended that because of this fact the demurrer should have been sustained. There was evidence that to disconnect the air hose it was necessary to go between the cars but that the cars could be coupled and uncoupled without so doing, there being an appliance

provided for that purpose. The evidence for respondent tended to show that it was the practice in the yards at North Platte, an important division point on appellant's line, to go between slowly moving cars to disconnect the air hose, that respondent had never seen the work done any other way during his employment or theretofore, though crossing the yards mentioned several times daily and frequently seeing the disconnection made. Respondent also testified that it was the custom of the brakemen and conductors with whom he worked in switching to go between slowly moving cars to make the disconnection and that the other crews he observed always did the work the same way. Witnesses for appellant denied the custom but several of them admitted they had gone between cars to disconnect the air hose. To this must be added the testimony that respondent was sent to Conductor McFarland for instructions as to methods of work and McFarland, among other things, told respondent that the practical way of doing the switching work included going between slowly moving cars to disconnect the air hose and demonstrated the process for respondent's benefit. At the same interview at which the officer, whose function it was to hire and discharge employees, sent respondent to McFarland for instructions he gave him a time card containing, among others, the rule relied upon. McFarland, while instructing respondent, represented the company (Lebbering v. Struthers, 157 Pa. St. l. c. 323; Atlas Engine Works v. Randall, 100 Ind. l. c. 297), and the instructions the evidence tends to show he gave tend to prove the company's knowledge of and acquiescence in the practice mentioned. Under the authorities (Brady v. Railroad, 206 Mo. l. c. 531; Railroad v. Smock, 23 Colo. l. c. 462, 463; Barry v. Railroad, 98 Mo. l. c. 69; Brady v. Railroad, 184 Mass. l. c. 228, 229; Railroad v. Flynn, 154 Ill. l. c. 454), this evidence was sufficient to make the aban-

donment of the rule a question for the jury and it may be said here that the instruction relating to that question was free from prejudicial error.

(5) Finally, it is insisted that respondent was guilty of such contributory negligence at the time as to bar a recovery. The rule of the Colorado court is that "whether or not, under all the circumstances, the negligence of the master, or the negligence of the servant, was the proximate cause of the injury, in all cases where there is any doubt, is a question for the jury." [Railroad v. Ogden, 3 Colo. l. c. 508.] In another case, in which the facts were that a switchman was injured by stepping between the ties on a partly planked trestle after he had gone between cars to couple them, the Supreme Court of Colorado, responding to a contention like that here, said:

"Whether the plaintiff saw, or by the exercise of reasonable caution should have seen, that the track was unplanked, is not a question of law, but a question of fact for the jury's determination. Whether it was or was not the duty of the plaintiff, under all the circumstances shown, to have stayed out from between the cars, waited until the train was stopped, and then made the coupling, it is not our province to determine. Whether plaintiff did or did not, under the facts disclosed by the record, choose a more dangerous method of making the coupling, and that by reason of his selecting the more dangerous method he was injured, is for the jury to pass upon, and is not a question of law for the decision of the court. Where there is uncertainty as to the existence of either negligence or contributory negligence, the question is not one of law, but of fact, to be settled by the jury; and this, whether the uncertainty arises from a conflict of the testimony or because of the facts being undisputed, fair-minded men will honestly draw different conclusions from them." [Railroad v. Brady, 45 Colo. l. c. 210.]

In that case the planking on the trestle extended

only part way and a planked way beside the track was provided for employees. Brady went between moving cars on the trestle and walked with the train, endeavoring to couple the cars, until he reached the end of the planking where his foot went between the ties and he was injured. The rule laid down is applicable to this case and results in the conclusion that the question as to respondent's contributory negligence was one of fact and not of law. [Hollenbeck v. Railroad, 141 Mo. l. c. 110; Vautrain v. Railroad, 78 Mo. 44; Hannah v. Railroad, 154 Mass. 529.] The instructions on this phase of the case were as favorable to appellant as it could demand and the criticism of their phraseology we do not deem sound. No authorities are cited condemning them or the principle they announce.

We do not deem it necessary to recapitulate, in this connection, the evidence tending to show contributory negligence and the lack of it. The facts the evidence tends to show have been fully stated in the first instance and those facts demonstrate so clearly the applicability of the rule quoted that to collect here again those bearing on this question would be entirely supererogatory.

IV. Some objections are made to the instructions given at respondent's instance but the criticisms, for the most part, are grounded on the same assumptions of fact made by counsel in their presentation of the complaint as to the action of the court in overruling the demurrer to the evidence and are answered by the principles to which we have already adverted. The instructions to the effect that if McFarland, at appellant's instance, instructed respondent that it was part of his duty in switching to go between moving cars to disconnect the air hose and if respondent complied with this special instruction as to method and circumstances, then the rule to the contrary was no

defense, was not erroneous. The fact that respondent had the printed rule and that the examining board subsequently provided him with another copy of the same rule (with 1879 others).was of no consequence since .others of these rules specifically required respondent to obey *"the rules and special instructions."* The contention that the company can now exonerate itself from liability for injury received by respondent while obeying the specific instructions given by McFarland, because there was a printed rule with which those specific instructions are alleged to conflict, is not tenable. If McFarland was directed to instruct respondent, as the jury could have found, he, in the capacity of such instructor, spoke for the company and as the company. In these circumstances it might well be held, in view of the fact that ambiguous rules of this character are to be most strongly construed against the company promulgating them (Railway v. M'Dernid, 177 Fed. 1. c. 108; Railroad v. Hopkins, 161 Fed. 1. c. 269), that the rule relating to coupling and uncoupling cars had no relation to the act of disconnecting the air hose. It is hardly necessary to go so far in this case, however. The instruction was not erroneous.

The principal instruction given for respondent was unobjectionable, in substance declaring it was appellant's duty to use ordinary care to furnish respondent a reasonably safe place to work, requiring ordinary care of respondent, and referring the jury to other instructions on the question of assumption of risk. The instruction as to assumption of risk fairly presented appellant's theory substantially as it requested and the definition of ordinary care was in ap proved form. The instructions asked and refused cover more than eleven printed pages and it is manifestly out of reason to set them out in full and reiter-ate, in connection with them, as appellant's counsel have done, the arguments as to assumption of risk,

contributory negligence, etc.  We have carefully con-
sidered them all and think the law of the case was
fairly given to the jury.

V.  It is also urged that the admission of evidence
to show the abandonment of the rule relied upon is
violative of the spirit of the Safety Appliance Act and
the case of Gilbert v. Railroad, 128 Fed. 539, is cited.
The act mentioned requires interstate carriers to equip
their cars with a device for coupling and uncoupling.
If the act does not require the installation of a device
for disconnecting the air hose the contention cannot
be upheld, and if it does require it, appellant had
wholly failed to comply with that requirement and
can find no shelter behind the act.  That there is a sub-
stantial distinction between uncoupling cars and dis-
connecting the air hose is indicated by decisions both
in this State and Colorado.  [Brady v. Railroad, 44
Colo. 1. c. 288; McManus v. Railroad, 118 Mo. App.
1. c. 162.]  The case cited by appellant has been, in
one particular, practically disapproved by this court
and we do not feel disposed to follow it in this case,
on the facts before us, if it is to be construed as ap-
pellant contends.  We do not, however, agree to that
construction.  There was no error in the admission of
the evidence mentioned.

VI.  The day following the completion of the evi-
dence appellant filed its motion to discharge the jury
because of the presence of respondent's wife and
three-year-old child during the trial and because, dur-
ing an intermission, while respondent was on the
stand, the child went to the father and was caressed
by him in the presence of the jury.  Affidavits filed
disclosed that most, probably all, of the members of
the jury were absent at the time of the last mentioned
incident.  It is not necessary to discuss the question
thus attempted to be presented.  All that need be
said is that no objection was made at the time and

it was too late, after the trial had thereafter proceeded for several days, to move for the jury's discharge. Affidavits filed disclosed that appellant's counsel were fully aware of the facts when they occurred. Besides, it was their business to be aware of them. [Ross v. Grand Pants Co., 241 Mo. 1. c. 296.]

VII. It is urged that respondent's counsel indulged in improper remarks in the closing argument. It is unnecessary to set out at length the arguments of which complaint is made. The record discloses that in passing upon this ground of the motion for new trial the lower court had before it the entire closing argument of respondent's counsel and affidavits showing that the arguments of appellant's counsel had been of such character as to elicit the remarks to which objection is now made. Counsel for appellant had referred, the affidavits indicate, to respondent's failure to bring photographs, blue prints, witnesses and additional depositions to prove the character of the construction of the incline switch and other switches on appellant's road. The evidence showed that appellant had brought all these things. In answer, in his closing argument, one of respondent's counsel asked the rhetorical question: "Do you think the poor boy has unlimited means to run all over this railroad like that railroad company, with their passes and their money?" Exception was taken without any objection having been made. Without regard to that, however, the remark now objected to was retaliatory in character and, in the circumstances we see no harm in it. That appellant was able and willing to meet and had met the expense of a careful preparation for trial was evident. The statement quoted followed a summary of the facts indicative of respondent's inability to do certain things from the failure to do which appellant's counsel had argued the jury must draw an unfavorable inference. At the most the trial court

did not abuse its discretion in ruling as it did on the ground of the motion for new trial relating to this matter. [Huckshold v. Railroad, 90 Mo. l. c. 559; Gidionsen v. Railroad, 129 Mo. 402, *et seq.*]

VIII. It is earnestly contended that the verdict is excessive.

Respondent's right leg was crushed from the ankle to the knee; the left leg was dislocated at the knee, the ligaments being torn; his right arm was bruised; there were two cuts on the leg severe enough to require several stitches to close the wounds; one ear was torn so that two or three stitches were necessary on it and there were injuries to the chest. Immediately after his injury respondent was hurried to Omaha to the hospital. There on the night after the injury his right leg was amputated, the three cuts were sewed and the left leg was set and put in splints. Respondent was confined seven or eight months, and was unable to work at all until nearly a year after he was injured. At the time of the trial the left knee was stiff, the stump of the right leg often pained respondent, he still had occasional pains in his chest, was unable to do any work which required him to stand, but was able to go to and from his work by aid of an artificial limb and, sometimes, a cane. He used crutches when the artificial limb wearied or pained him. He was put to some expense, totaling two or three hundred dollars.

It is not unusual in this State to affirm judgments of $10,000 for the loss of a single leg. In addition to the loss of his right leg respondent suffered other serious injuries, some permanent, some otherwise, which must be taken into account. In several instances judgments for $20,000 for the loss of both legs have been affirmed and judgments in excess of that amount have on more than one occasion been reduced to the sum named.

At the time of his injury respondent was a young man, twenty-seven years of age and in good health. In the circumstances the pain he suffered must have been intense and that his capacity to cope with life's responsibilities has been most seriously impaired cannot be doubted. The nature and extent of his injuries are not disputed. That he is entitled to compensation is put beyond question by the verdict of the jury and what has already been said. But the ever vexing question as to the justness of the amount fixed by the verdict reappears. In the case of Lessenden v. Railroad, 238 Mo. 266, et seq., will be found an illuminating discussion of the perplexities which confront juries and judges who come to this question in the course of their respective duties. In view of what is said in that case and of the facts in this, this judgment, when the rules there announced are applied, seems excessive and it should be reduced to $15,000.

IX. It is practically impossible in the course of an opinion to follow counsel, in detail, through the six hundred and odd pages of briefs filed in this case. The various questions raised have been considered and carefully examined with the result that the conclusion has been reached that the judgment ought to be affirmed on the condition that respondent enter a remittitur, as of the date of the original judgment, of $10,000. If respondent enters such remittitur within ten days the judgment will stand affirmed in the sum of $15,000, as of the date of the original judgment. Otherwise the judgment will be reversed and the cause remanded for new trial. *Roy, C.,* concurs.

PER CURIAM.—The foregoing opinion of BLAIR, C., is adopted as the opinion of the court. All the judges concur; *Kennish, J.,* adhering to the views expressed by him in Partello v. Missouri Pacific Railway Company, 240 Mo. 122, l. c. 143, on the subject of remittitur.